**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ACTEON, INC. D/B/A COMEG MEDICAL, | : | |
| Plaintiff, | : | Hon. Joseph H. Rodriguez |
| v. | : | |
| | | Civil Action No. 1:17-CV-00187 |
| ERIC HALVORSON, | : | |
| Defendant. | : | OPINION |

This matter comes before the Court on Motions of Defendant Eric Halvorson [Dkt. No. 24] and Plaintiff, Acteon, Inc. d/b/a Comeg Medical [Dkt. No. 25] seeking summary judgment, pursuant to Fed. R. Civ. P. 56. The Court has considered the written submissions of the parties, as well as the arguments advanced at the hearing on April 17, 2019.  For the reasons stated on the record that day, as well as those that follow, the Plaintiff's motion is denied, and Defendant's motion is denied in part and granted in part.

## I.     Background

### A.  Plaintiff's Business

Plaintiff, Acteon, Inc. d/b/a Comeg Medical ("Plaintiff," "Comeg," or "Acteon") "designs, manufactures, markets and/or distributes proprietary dental equipment, including but not limited to imaging systems, dental implant systems, hygiene systems, and dental tips." [Dkt. No. 1 (Compl.) at ¶8]. Acteon is the wholly owned subsidiary of Acteon Group, a European Company. Plaintiff Acteon is "the only company that does any business in North America." Harbuck Dep. 15:7-15. Acteon uses "Comeg" as a brand name for commercial purposes. Pochon Dep. 72:8-1. Initially, Acteon was doing

1

business under the Comeg name in France. Now, Comeg is used to primarily to sell "endoscopes and products for endoscopic surgery" throughout the United States, Canada, Puerto Rico, and Latin America. Id. at 18:12-16. The parties agree that Comeg was entering a U.S. market with well-established competitors. Building the business was going to be a challenging and difficult task. Harbuck Dep. 24; Nelson Dep. 30:7-31:10.

In efforts to expand Comeg, Plaintiff hired Eric Halvorson, the Defendant ("Defendant" or "Mr. Halvorson"), and the parties entered into a formal Employment Agreement on November 23, 2015. (Eric Halvorson's Employment Agreement, Def. Ex. A); Def. SOMF ¶ 1. Mr. Halvorson was "recruited to make a business out of a nothing business" and build Comeg's sales in the U.S. as the General Manager of Medical Americas Division. Pochon Dep. 145:1-5, 56:4-7. From February 23, 2016 until his termination, the Defendant also served under the title of President, Medical Americas Division, which Plaintiff insists came without any additional responsibilities. Id. at 15:15-25; 16:1-6.

## B. Defendant's Employment Agreement

According to Section 2.1 of Defendant's Employment Contract his duties as General Manager and "President" were as follows:

Executive shall diligently and competently perform such reasonable duties in connection with the business and affairs of Company as may be assigned to him by Company's Chief Executive Officer or Company's Board of Directors (the "Board of Directors") from time to time, including but not limited to market development in the United States, Canada, Central America and Latin America, determining budget requirements, development of direct and distributor sales organizations, building and implementing training and education programs for surgeon customers in the sales force, building a scalable commercial operations support team, implementing appropriate dashboards to measure and manage performance and results and determining the clinical and economic evidence required to support product value propositions and key selling tools. Executive shall report to Company's Chief Executive Officer.

Def. Ex. A

Plaintiff further describes Defendant's duties as "commercial marketing and sales;" he was to generate sales forecasts and "develop the sales which were absolutely nonexistent before him." Pochon Dep. 49:16-20; 35:1-5. Defendant was regarded as a highly paid executive; whose annual base salary was $360,000. Def. Ex. A, Section 4.1. The Employment Agreement between the parties also provides how Plaintiff may terminate Defendant's employment with the company. Pursuant to Section 7.1.1, Plaintiff had the option to terminate Defendant's employment "for cause." Section 7.1.1 states as follows:

Company may terminate Executive's employment immediately at any time for Cause. For purposes of this Agreement, "Cause" is defined as: (A) EXECUTIVE'S REPEATED FAILURE TO FOLLOW THE REASONABLE AND LAWFUL DIRECTIVES OF THE COMPANY'S CHIEF EXECUTIVE OFFICER OR BOARD OF DIRECTORS; (B) THE MATERIAL BREACH BY EXECUTIVE OF ANY OF EXECUTIVE'S COMMITMENTS, DUTIES, OR OBLIGATIONS UNDER THIS AGREEMENT; or (c) Executive's conviction or indictment for a felony, or if Executive enters a guilty plea or plea of no contest with respect to a felony; provided, however that in the case of (a) or (b) above, if in Company's reasonable discretion, the failure or breach is curable, Executive shall be notified in writing of the failure or breach and shall be given thirty (30) days from receipt of such written notice to cure the failure or breach to the Company's satisfaction. In the event Executive's employment is terminated in accordance with this Section 7.1.1, Executive shall be entitled to receive only (a) the portion of Executive's Base Salary earned through the date of termination; (b) reimbursement of Executive's reasonable and necessary out-of-pocket business expenses as provided in Section 6.1 through the date of termination of employment in accordance with Company's policies; and (c) any accrued and vested benefits under Company's benefit plans, which shall be paid or provided in accordance with, and remain subject to, the provisions of the applicable plans or arrangements (collectively, the "Accrued Amounts"). All other Company obligations to Executive pursuant to this Agreement will become automatically terminated and completely extinguished.

Def. Ex. A (emphasis added).

In addition, the Employment Agreement provides that Halvorson's employment may be terminated "without cause," in which case Plaintiff agreed to pay "(a) the Accrued

Amounts and (b) any Prior Year Bonus . . . . In addition [Mr. Halvorson] will receive a case severance payment in an amount equivalent to nine (9) months of [Mr. Halvorson]'s Base Salary (the 'Severance Payment')." Id.

## C. Defendant's Employment

During his employment, Defendant was to report to Plaintiff's CEO, Ms. Marie Laure Pochon ("Ms. Pochon"). Def. Dep. 72:22. In January 2016, Defendant provided Ms. Pochon with an initial sales forecast for Comeg projecting approximately $4 million in revenue for that year alone (2016). Pochon Dep. 58:10-14; Def. Dep. 45:11-13. According to the Defendant, he continued to send Ms. Pochon multiple regular business updates, which included additional sales forecasts. Def. SMOF ¶ 19. Defendant claims that the forecasts were updated as the targets changed during his tenure, however Plaintiff asserts that Defendant's overall projections were never changed or updated. Andrea Nelson, Defendant's employee, testified that the sales forecasts were subject to change. Nelson Dep. 100:1-4. She would give projections to Mr. Halvorson that were not "concrete," rather plans that could change drastically. Id. at 103. Overall, Defendant testified that he provided reviews, forecasts, and presentations to Ms. Pochon during his employment, but admits that "revenue was lower than what the forecast and projections were." Def. Dep. 44:4-7; 44:8-15.

In his role at Comeg, Defendant "was in charge of hiring his own sales team." Pl. SOMF 6. He assembled a team that consisted of a Marketing Director, Sales Representatives, an Administrative Assistant, and a Sales Director. Id. at 45. Ms. Pochon knew that Defendant was hiring people for certain roles but was unaware that Andrea Nelson ("Ms. Nelson") was hired as Director of Sales, in which she maintained a dual role. Specifically, Ms. Pochon stated that Defendant made known that he wanted an

"important person next to him . . . who was Marketing Director" but gave no intention of having a Sales Director. Pochon Dep. 26:7-25. She claims it was clear in their conversations together that "nobody would be hired as a Sales Director." Id. at 28:4-9.

Defendant hired Ms. Nelson in April 2016. She testified that the Defendant was not "transparent" about her role at Comeg and that he had not communicated why she was hired to other employees. Nelson Dep. 91. Ms. Nelson, however, confronted Defendant about the situation, did not hide her position, and represented herself as the director of sales, which included having her position in her E-mail signature. When asked about hiring staff, Defendant testified that as President of Comeg's U.S. division, he had "full responsibility to make those decisions." Def. Dep. 53:15-20. According to him, he was not required to inform the board or Ms. Pochon of Ms. Nelson's specific responsibilities. Def. Dep. 53:21-25.

Plaintiff claims that Ms. Nelson's, large salary was not approved, and further contends that Defendant had Ms. Nelson performing his own responsibilities without permission. [Dkt. No. 25 (Pl. Brf.) at 4]. In Defendant's deposition he explained: "[Ms. Nelson] helped in many ways. She helped in training the sales group, she helped in closing sales, she had direct interaction with sales people every day to get them up to speed. She was much stronger than the other sales people, so I wanted to use her best practices." Def. Dep. 70:8-13. Defendant further acknowledges that he had Nelson helping create business plans; he also states that he would get input from "many people," including others on the sales team. Def. Dep. 59:20-25.

Ms. Pochon met Ms. Nelson during a visit in May 2016, at which Ms. Nelson was presented to her as a sales representative who would be a promising sales director if sales developed well. Pochon Dep. 27. In time, board member, Thomas (Rick) Harbuck

("Mr. Harbuck"), was aware of Ms. Nelson's exact position at Comeg. Harbuck Dep. 47:19-25. He was impressed that the Defendant had brought Ms. Nelson on board and thought it was a "good move;" she contributed good contacts with customers and clients. Id. at 48:3-10.

According to Ms. Pochon, in August 2016, she had a "long and difficult" conversation with the Defendant regarding sales development. Pochon Dep. 69-71. During this conversation, she did "everything to wake him up, to make him understand," but there was no mention of any possible termination of his employment. Id. at 69:1-9. Ms. Pochon told the Defendant that she wanted him to "spend more time with dealers, with current customers." Id. at 80:21-25. Defendant urges that he did so. He names "Medtronic," "Endodcopy Services," "Optum," and "D-Scope" as clients he met with. Def. Dep. 85-86. "[Defendant] spent some time in the field with people." Nelson Dep. 108. He characterized his time at Comeg as "20% to 40% of [his] time out of the office" and the rest of the time in the office. Id. at 77:4-6.

In September 2016, Defendant recalls that Ms. Pochon expressed her disappointment that the sales take off was "far from plan." Id. at 78:4-16. Then, in October, Mr. Harbuck visited Comeg U.S. to observe the Defendant at work. See Def. Ex. G. Mr. Harbuck's main job is to observe Comeg and aid the division's leader. Harbuck Dep. 16:21-25. During his visit, Mr. Harbuck went out in the field with Ms. Nelson. When asked if she expressed any concerns at that time, Mr. Harbuck stated that she did "not really" indicate dissatisfaction with Mr. Halvorson but he recalls that "[c]onfidence in his leadership ability . . . was questioned." Id. at 53:18-22.

Ms. Nelson had a lack of confidence in Defendant. She claims she had several conversations with Defendant about her concerns, she tried to let him know "what was

lying ahead of [them]," that things were going to take time at Comeg, and give him relevant advice; however, she kept having to have those conversations multiple times. Nelson Dep. 109-110. According to Ms. Nelson there were similar concerns with the other sales representatives, namely that the Defendant was "out of touch" with the current market that Comeg was trying to sell in. Id. at 141:2-6. She was frustrated in Mr. Halvorson's lack of understanding and felt there was a disconnect in communication "going back and forth with France." Id. at 147:22-25. Ms. Nelson "could tell [Defendant] was under pressure. Id. at 148:1-2.

After Mr. Harbuck's visit with Defendant and his sales team, he sent an email to the Defendant with an attached memo from his "October 10, 11, 2016 Visit" [Ex. G to Def. Op. ("Harbuck's Memo")]. The email and Memo present an overview of his observations, concerns and recommendations that he had at the time. Together they state that he was "impressed" and "confident with where Comeg US is at present." Id. Harbuck's Memo also indicates that there was some "confusion and lack of confidence." Mr. Harbuck expressed that his email and certain positive notes from his visit were "an effort to boost Halvorson's confidence, and provide him with some type of optimism that he could get the job done." Harbuck Dep. 35:12-24. At some point, Harbuck's Memo was forwarded to Ms. Pochon. Id. at 4:11-17. Defendant followed up with Mr. Harbuck to address some of his concerns." Id. at 30-31.

In November 2016, Ms. Pochon requested a business update, which showed U.S. sales to "dealers" decreased another 20%. Pochon Dep. 39:3-12, 13-17. Defendant has pointed to certain difficulties with the nature of the business itself and internal issues at Comeg. Some of these "huddles" were expressed to Mr. Harbuck, such as pricing, cost of goods sold, and instructions for products not meeting U.S. standards. Harbuck Dep.

55:16-25. In addition, there was "significant backorder" on the product line. Def. Dep. 74:11-13.

According to Ms. Pochon, Defendant was given multiple repeated notices, both written and oral, of the deficiencies in his work product and his failures to follow directives. See Pochon Dep 22; Pl. SOUMF ¶ 11. Still, Defendant claims that he "wrote emails along the way giving Marie Laure updates on if interesting things were occurring. It was not uncommon to send her notes." Def. Dep. 63:10-12. He testified: "I sent her updates on, basically, a monthly basis for the projections," and "I don't think that they ever said that I wasn't performing well. We talked about the business not performing well." Id. 64:4-5; 77:23-25. The parties agree that, ultimately, Comeg did not reach Defendant's projection in his initial sales forecast.

### D. Defendant's Termination

Ms. Pochon was unhappy with Defendant's sales and made the decision to let him go. Pochon Dep. 63:14-16. She reached out to Mr. Harbuck to discuss how Comeg would operate moving forward if Defendant's position was no longer there. During that conversation, she informed him that Defendant's role was, in fact, being eliminated. Ms. Pochon also had a conversation with Ms. Nelson, during which she informed Nelson that Defendant would be let go and wanted to confirm that she could assume some of his duties moving forward. Nelson Dep. 151:3-13.

Plaintiff provided Halvorson with a formal notice of termination by letter, dated November 21, 2016. [Dkt. No. 27, Ex. B (Eric Halvorson's Termination Letter)]. The letter stated that his termination was "for cause" pursuant to Section 7.1.1 of his Employment Contract but did not include notice of the alleged reasoning. Ms. Pochon testified to firing Defendant, explaining that "Mr. Halvorson gave me many, many times the feeling that,

okay, I sent you a forecast in January. We will not meet the forecast, but it's not really important. I will send you a new forecast. Probably, in some big companies, it's acceptable, but in a company like Acteon, it's absolutely not acceptable to think that it is normal to reforecast and to change by half each of your commitments." Pochon Dep. 44:19-51:25; 86:21-87:13

At the termination meeting, Pochon claims that she explained to Defendant "that the results were not there and [she] was not satisfied of the way he was driving the commercial part of the - - of Comeg in the U.S." The General Manger in the company was expected to be in the field, "not sitting in his office" a "major lack" was that Defendant was not with customers. Id. at 62:4-9. Specifically, the CEO stated, "we dismissed Mr. Halvorson because he was absolutely not doing his job properly in terms of behavior and in terms of results. And . . . he was acting absolutely outside of all of the rules of the company." Id. at 80:24-81:4.

Defendant declares he did not fail to follow directives from either Ms. Pochon or the Plaintiff's board of directors. Declaration 2, Def. Ex. 2. Plaintiff further claims that "Defendant's administrative assistant was also tasked with overseeing employee expense reports, a responsibility that should have been handled solely by Defendant. Said assistant, with Defendant's approval, approved expenses that included a tv, subwoofers, trips taken outside of the scope of work, and rental cars outside of a sales reps territory, all of which are violations of Acteon Policy." Pl. SOUMF ¶ 12. Plaintiff's admit they learned the specific issues with these expense reports after this litigation was commenced. [Dkt. No. 35 (Oral Arg. Tr.) at 8].

The Plaintiff did not provide Mr. Halvorson with a cure period, to cure any performance issues that the company found. According to Acteon, it determined in its

discretion "that Defendant's many bad faith breaches and deceptions were in no way curable, voiding the 30 day cure period as was reasonably determined by Plaintiff."[Dkt. No. 24-4 (Pl. SOMF in op.) ¶ 12.]

### E. Procedural background

Post-termination, Defendant demanded payment of severance pursuant to his employment agreement. **Pl. Ex. G.** Following the demand, Plaintiff commenced this action and filed a complaint with this Court on January 11, 2017. [Dkt. No. 1]. Plaintiff's complaint alleges breach of contract (Count I), breach of duty of good faith and fair dealing (Count II), and requests injunctive relief and declaratory judgment (Count III). Defendant filed an Answer and Counterclaim on February 3, 2017, "seeking payment of the severance pay under the Employment Agreement." [Dkt. No. 4]. Defendant's counterclaim similarly alleges breach of contract (Count I) and breach of good faith and fair dealing (Count II). Plaintiff filed an Answer and Affirmative Defenses to Defendant's Counterclaims on February 15, 2017. [Dkt No. 8].

Currently before the court are cross-motions for summary judgment. Defendant Halvorson filed a Motion for Summary Judgment on January 9th, 2018 [Dkt. No. 24] and Plaintiff's filed a Motion for Summary Judgment against Defendant's Counterclaims on January 11, 2018. [Dkt. No. 25]. The parties have responded in opposition to each other's motion and each have replied respectively. [Dkt. Nos. 26-29]. On April 17, 2019 the Court held Oral Argument on both motions. [Dkt. No. 35].

## II.     Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Pearson v.

Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

III.  <u>Analysis</u>

**A.  Defendant's Motion for Summary Judgment on Plaintiff's Claims.**

Defendant moves for summary judgment dismissing Plaintiff's Complaint, which includes claims for breach of contract, breach of the implied covenant of good faith and fair dealing, injunctive relief or declaratory judgment. In addition, Defendant's motion for Summary Judgment seeks to preclude Plaintiff from invoking a mitigation defense. The Court will not address Defendants preventive argument to prevent Plaintiff from asserting a mitigation defense, a defense that Plaintiff has not pled nor asserted in this case. The Court cannot make a preemptive ruling on the issue because Defendant wants to ensure this defense "[i]s out of the case for trial purposes." Oral Arg. Tr. 6:4-6.

*1.  Breach of Contract*

Under New Jersey law, there are four elements plaintiff must establish to prevail on a breach of contract claim: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." <u>Frederico v. Home Depot, Inc.</u>, 507 F.3d 188, 204 (3d Cir. 2007). In this case, there is a valid contract between the parties,

namely, Defendant's Employment Agreement. Defendant's motion does not address the issue of breach, he only moves for summary judgment on the basis that Plaintiff cannot prove damages. Defendant argues that Plaintiff has not claimed any damages and therefore, its contract claim must fail.

"The general rule is that whenever there is a breach of contract or an invasion of a legal right, the law ordinarily infers that damage ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 45-46 (1984) (citations omitted). Here, Plaintiff contends that it has suffered damages as a result of Defendant's alleged breach of his employment contract stating that, "Defendant lost Comeg and Acteon untold millions of dollars in sales and further damaged the already existing sales to the tune of over a million dollars." Plaintiff recognizes that it is "not seeking monetary compensation for damages suffered." Pl. Brf. at 9, 15. Plaintiff "seeks only to free itself from liability." Pl. Brf. at 9.

The deposition testimony of Plaintiff's CEO, Ms. Pochon, further indicates that Plaintiff is not seeking any money from the Defendant in this case. Defendant points out that Plaintiff has not provided proof of the damages it supposes; however, Plaintiff is not required to prove actual damages. Plaintiff still alleges that it has experienced damages in the form lost sales. It also claims that that Defendant has caused "great cost" to Plaintiff's rebuild of the company and damage to existing contract and its reputation. Pl. Br. at 14-15 ("Comeg was taken over by Defendant with a million dollar plus contract already in place and by the time of Defendant's termination, was left with that contract in doubt and zero other significant advancements financially). "While the damages flowing from defendant's breach of contract are not ascertainable with exactitude, such

is not a bar to relief." <u>Kozlowski v. Kozlowski</u>, 80 N.J. 378, 388 (1979). Furthermore, this Court has held that a party's failure to seek monetary damages is not fatal, the Plaintiff need only prove breach, from which the court may award nominal damages.[1] <u>Allia v. Target Corp.</u>, No. CIVA07-4130 NLHAMD, 2010 WL 1050043, at *14 (D.N.J. Mar. 17, 2010) ("Target has not asked for, and has not shown, any monetary damages resulting from plaintiff's breach. This is not fatal to its claim, as Target need only prove a breach of the contract, and not actual damages.").[2] Therefore, the Court Denies Defendant's Motion for Summary Judgment as to Count I of Plaintiff's Complaint for Breach of Contract.

## 2. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Second, Defendant argues that Plaintiff's claim against him for breach of the implied covenant of good faith and fair dealing fails because (1) there is no bad faith by Defendant, and (2) no damages to Plaintiff. The Court finds that the record lacks sufficient facts to create a material dispute as to whether Defendant acted in bad faith and therefore, breached the covenant.

The implied covenant of good faith and fair dealing requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Ass'n Grp. Life, Inc. v. Catholic War</u>

---

[1] Here, Defendant Halvorson does not make any argument as to Plaintiff's proof of the alleged breach of contract. He only disputes the element of damages.

[2] In his reply brief to Plaintiff's opposition, Defendant contends that cases such as <u>Allia</u> are distinguishable from the one at hand "because in those cases, the claimants claimed damages but were unable to prove actual damages, so the courts found that where a breach is established, the law infers "nominal" damages." As stated above, the Plaintiff here has not "waived" the issues of damages. Although Plaintiff does not seek compensation for actual damages, it claims damages as a result of Defendant's alleged breach of his Employment Agreement.

Veterans of U. S. of Am., 61 N.J. 150, 153, (1972). Plaintiff is required to establish a contract existed, that defendant acted in bad faith, and that defendant's actions caused damages. See Wade v. Kessler. Inst., 343 N.J, 338 (2002); N.J. Civ. Model Jury Charge 2.15.

Accordingly, a plaintiff must offer "evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." MZL Capital Holdings, Inc v. TD Bank, N.A., 734 F. App'x 101, 105–06 (3d Cir. 2018) (quoting Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 225 (2005)). Under New Jersey law, a defendant is therefore, liable for the breach of this implied covenant when he "acts with ill motives and without any legitimate purpose" and when the plaintiff's "reasonable expectations are destroyed." Webster v. Dolgencorp, LLC, No. CIV.A. 13-0690 JEI, 2013 WL 4501461, at *6 (D.N.J. Aug. 22, 2013); Di Carlo v. St. Mary Hosp., 530 F.3d 255, 267 (3d Cir. 2008).

Here, there is no dispute that a contract between the parties exists, Defendant's Employment Agreement. The Court, however, agrees with Defendant and finds that Plaintiff has not provided evidence to support a finding of bad faith on part of Defendant. The New Jersey Supreme Court has cautioned that "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an improper motive." Wade, 172 N.J. at 341 (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 255 (2001)). Although, as the Court addresses in detail infra, there is a genuine dispute over the underlying facts that Plaintiff uses to support is breach of covenant claim, Plaintiff fails to show that material facts exist as to whether Defendant acted with improper motive thereby breaching the convent.

Instead, Plaintiff relies on the same facts it puts forth in support of its breach of contract claim, and moreover, in support of its termination of the Defendant, to argue that Defendant has breached the covenant. According to Plaintiff, Defendant acted in bad faith "by failing to accurately, completely and honestly report to [Ms. Pochon] and by using company funds to approve absurdly inappropriate employment expenses and hire additional employees for excessive salaries to complete his job responsibilities." Pl. Brf. at 17. Plaintiff also points to the fact that Defendant was allegedly "hiding" Ms. Nelson's true role at Comeg from the CEO and the board. Plaintiff suggests that Defendant's conduct "exceed[s] incompetence" and further alleges Defendant's ill motive is evidenced by the fact that he was still collecting his salary while "deceiving" and "lying" to Plaintiff. Id. at 18,19.

Even if Plaintiff could prove the Defendant did not honestly report to [Ms. Pochon] and/or "lied"[3] about Ms. Nelson's role at Comeg, nothing in the record suggests that Defendant did so with ill motive. In fact, Ms. Pochon suggests that defendant may have found his reports to her were "acceptable." Pochon Dep. 87. As the CEO, she also testified that she does not think Defendant has done anything "malicious" to harm Plaintiff's business. Id. at 92:22-93:8. Plaintiff has not provided evidence to rebut Ms. Pochon's declaration.

Additionally, testimony in this case suggests that Defendant acted to help Comeg in hiring Ms. Nelson. Ms. Harbuck stated that hiring Ms. Nelson to perform the duties she was assigned was a good idea. He commended the Defendant for the strategic move,

---

[3] Although testimony shows that Defendant was not "transparent" about Ms. Nelson's position, Mr. Harbuck, who was on the board, knew of Ms. Nelson's position. Further testimony also shows that Defendant did not affirmatively lie about Ms. Nelson's salary.

which Mr. Harbuck testified was overall, a good move for Comeg. Harbuck Dep. 47:19-25; 48:3-10. In fact, Plaintiff replaced the Defendant with Ms. Nelson after his termination. While the record shows that Defendant's colleges were not happy with his performance, there are not sufficient facts to warrant an inference that Defendant was acting in bad in faith. Ms. Nelson's testimony provides that "[h]e seemed very excited about what he was taking on." Nelson Dep. 50:19-20.

Moreover, Plaintiff offers no proof that Defendant knew any employment expenses were inappropriate. Defendant admits he was not reviewing the reports himself, having delegated that task, which suggests Defendant would not be aware of the specific charges that were being made. Whether the delegation of this task, along with the hiring of employees for large salaries "to complete his job responsibilities" were appropriate actions for Defendant to take, are in dispute. But Ms. Pochon was not required to be informed of Ms. Nelson's salary and she "was aware of the [other] reps and the people that he was recruiting." Pochon Dep. 89:19-22. Defendant's behavior regarding his termination was described as "not in accordance to the company." Id. at 87:1-16. Ms. Pochon had lost confidence in his ability to run Comeg. Id. at 87:14-16. Plaintiff now cites the same conduct alleged in justifying Defendant's termination, to claim he breached the covenant of good faith and fair dealing without sufficient evidence to support that Defendant acted without a legitimate purpose.

Accordingly, the Court grants Defendant Summary Judgment as to Count II of Plaintiff's complaint.

### 3. *Injunctive Relief or Declaratory Judgment*

Lastly, Defendant moves for Summary Judgment on Count III of Plaintiff's Complaint which requests Injunctive Relief and Declaratory Judgment "declaring that

Plaintiff rightfully terminated Defendant for cause pursuant to the contract." Compl. ¶¶ 18-20. Plaintiff did not address its claim for injunctive relief in its brief and conceded at Oral Argument that it is unsure what exactly it seeks to enjoin here. Oral Arg. Tr. 16:10-11. The Court further finds that there is no proper place for injunctive relief in this case. Plaintiff's CEO testified:

> Q. As far as you know, did Mr. Halvorson, after he was no longer employed by Acteon, Inc., steer business away from Comeg to somebody else?
> A. No.
> Q. Are you aware of Mr. Halvorson assisting any competitor of Comeg in any way?
> A. Not to my knowledge.

Pochon Dep Tr. 9215:21.

There is no evidence of any basis for injunctive relief, Plaintiff has not alleged that Defendant has taken any actions post-termination that have or will cause damage to its business. In fact, Acteon does not allege that the Defendant "tried to hurt Acteon's business" in any way after he was let go. Pochon Dep. 114:22-115:5. Instead, Plaintiff makes clear that it has brought this action "to seek a declaratory judgment that Defendant was terminated for cause."

The Court also finds that declaratory judgment in this matter would be improper. The DJA provides that "[a] person ... whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." N.J. Stat. Ann. 2A:16–53.

The Court has discretion to refuse declaratory relief "where there is a more effective remedy or where a declaratory action will not settle the controversy or where a person institutes a suit merely for a declaration that he has a good defense to an impending

action." <u>Util. Blade & Razor Co. v. Donovan</u>, 33 N.J. Super. 566, 57 (App. Div. 1955). When "the suit is not imminent and the declaratory proceeding will relieve a party of a burden and would seem-in any event, through the interposition of a counterclaim-to settle the entire controversy, it may be unjust not to permit him to sue immediately to free himself of liability." <u>Donovan</u>, 33 N.J. Super. at 573 (App. Div. 1955). This is not the case here.

Under the circumstances in the present case, Plaintiff acknowledges it seeks declaratory judgment as a direct response to a threat of litigation from the Defendant following his termination. Pl. Brf. at 9. Furthermore, the DJA is designed "to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations," meaning that individuals may "present bona fide legal issues to the court for resolution." N.J. Stat. Ann. 2A:16-51; 2A:16–53; <u>Matter of New Jersey Firemen's Ass'n Obligation to Provide Relief Applications Under Open Pub. Records Act</u>, 230 N.J. 258, 274 (2017). Here, the Court is presented with a breach of contract case regarding Defendant's Employment Agreement, as Plaintiffs first count in its complaint recognizes. The central issue to be decided in this matter is whether Defendant was fired "for cause" pursuant to his Employment Agreement. The term "for cause" is clearly defined in that Agreement and therefore, the specific inquiry concerns the justifications for Defendant's termination and whether such justifications are sufficient to defeat payment of severance under the contract between the parties. Accordingly, Plaintiff's seek declaratory judgment on a question of fact.

For the reasons stated below, the Court finds that there is a genuine dispute of material fact as whether Plaintiff's reasoning for Defendant's termination satisfies "for cause" under the contract. "[A] declaratory action does not enable a party to escape a

jury trial." Util. Blade & Razor Co. v. Donovan, 33 N.J. Super. 566, 572, 111 A.2d 300, 303 (App. Div. 1955) (citing N.J.S. 2A:16-58) Thus, the Court cannot afford Plaintiff any declaratory relief and therefore, grants Defendant's Motion for Summary Judgment as to Count III of Plaintiff's Complaint.

**B. Plaintiff's Motion for Summary Judgment on Defendant's Counter Claims**

Plaintiff moves for summary judgment in the form of a declaratory judgment. The Plaintiff seeks a declaratory judgment stating that "Defendant was terminated for cause from his employment with Plaintiff and that Defendant breached his contract with Plaintiff and his duty of good faith and fair dealing owed to Plaintiff," as set forth in Plaintiff's Complaint Count I and II.[4]

At oral argument, the parties agreed that the central issue to be decided in the case is whether Defendant, Mr. Halvorson, was terminated for cause. The defense argues that while the Plaintiff had the right to terminate his contract, they have an obligation under that contract to pay him severance pay pursuant to Section 7.2. Defendant bases this argument on the fact that "for cause" termination is a termination for misconduct. Oral Arg. Tr. 7:17-22. Any performance-based reason for termination under the contract, according to Defendant, is without cause termination, and therefore triggers Plaintiff's obligation to pay the defendant severance. Id.

---

[4] To the same extent that the Court grants Defendant's Motion for Summary Judgment on Plaintiff's Breach of Implied Covenant and Fair dealing claim, it denies Plaintiff's Motion for Summary Judgment seeking declaratory Judgment that Defendant has breached the Implied Covenant.

1. *Breach of Contract*

Under New Jersey law, a termination is considered "for cause" if the termination is "based on facts that are (1) supported by substantial evidence and (2) are reasonably believed by the employer to be true and also (3) is not for an arbitrary, capricious, or illegal reason." <u>Argush v. LPL Fin., LLC</u>, No. CV 13-7821, 2016 WL 7424260, at *4 (D.N.J. Dec. 23, 2016) (quoting <u>Spano v. JP Morgan Chase Bank</u>, 2011 WL 6934837, at *6 (D.N.J. Dec. 30, 2011)). The parties defined the term "for cause" in Defendant's Employment Agreement, and "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction, and we must enforce those terms as written." <u>Kutzin v. Pirnie</u>, 124 N.J. 500, 591 A.2d 932, 936 (1991) (citation omitted).

Section 7.1.1. of Defendants Employment Agreement governs termination. It states in relevant part:

Termination for Cause. Company may terminate Executive's employment immediately at any time for Cause. For purposes of this Agreement, "Cause" is defined as: (A) EXECUTIVE'S REPEATED FAILURE TO FOLLOW THE REASONABLE AND LAWFUL DIRECTIVES OF THE COMPANY'S CHIEF EXECUTIVE OFFICER OR BOARD OF DIRECTORS; (B) THE MATERIAL BREACH BY EXECUTIVE OF ANY OF EXECUTIVE'S COMMITMENTS, DUTIES, OR OBLIGATIONS UNDER THIS AGREEMENT . . . In the event Executive's employment is terminated in accordance with this Section 7.1.1, Executive shall be entitled to receive only (a) the portion of Executive's Base Salary earned through the date of termination; (b) reimbursement of Executive's reasonable and necessary out-of-pocket business expenses as provided in Section 6.1through the date of termination of employment in accordance with Company's policies; and (c) any accrued and vested benefits under Company's benefit plans, which shall be paid or provided in accordance with, and remain subject to, the provisions of the applicable plans or arrangements (collectively, the "Accrued Amounts"). All other Company obligations to Executive pursuant to this Agreement will become automatically terminated and completely extinguished.

Def. Ex A.

Therefore, under defendant's contract "For Cause" termination is a termination for repeated failure to follow the reasonable and lawful directives of the company's chief executive officer or board of directors; or the material breach by executive of any of executive's commitments, duties, or obligations under the agreement. Id. Section 2.1 defines Defendant's Duties; it provides *inter alia*, that Defendant was required to

Diligently and competently perform such reasonable duties in connection with the business and affairs of Company as may be assigned to him by Company's Chief Executive Officer or Company's Board of Directors (the "Board of Directors") from time to time, including but not limited to market development in the United States, Canada, Central America and Latin America, determining budget requirements, development of direct and distributor sales organizations, building and implementing training and education programs for surgeon customers in the sales force, building a scalable commercial operations support team, implementing appropriate dashboards to measure and manage performance and results and determining the clinical and economic evidence required to support product value propositions and key selling tools. Id.

Plaintiff claims that Defendant was terminated "for cause" pursuant to Section 7.1.1. The parties agree that the reasons given for Defendant's termination deal with his performance as an employee at Comeg. Oral Arg. Tr. 9-8, 25, 30:11-13. Plaintiff has acknowledged that its position "is that [defendant] was not doing his job, and not doing the job falls within a for-cause definition." Id. at 25:21-25. Defendant disputes not only the legitimacy of the reasons for his termination but argues that such reasons would not amount to a for cause termination under his contract in any event, as they are based solely on his job performance. Defendant argues that "performance-based termination of employment under this contract is without cause." Id. at 7:17-18. For the reasons that follow, the Court finds that genuine issues of material fact exist as to whether Plaintiff's reasons for Defendant's termination may constitute a for cause termination under the Employment Agreement. Additionally, for the reasons stated *supra* in the Court's discussion of Declaratory Judgment, Plaintiff's Motion for Summary Judgment is

denied.

Plaintiff provides the following reasons for Defendant's termination with Acteon: Failure to meet his sales projections, go into the field with his sales team to establish new connections, meet with clients, assist his sales team, commit the appropriate and expected amount of time to market development, adequately and appropriately determine budget requirements, report to his CEO; and his inappropriate approval of expense against the company's protocol. Pl. Brf. at 13, 14.  First, Plaintiff alleges that Defendant's termination "for cause" was in accordance with his Employment Agreement because his removal was "a result of his failure to follow the reasonable and lawful directives of the company's CEO and Board of Directors." Id.

According to the CEO, Defendant was given multiple repeated notices, both written and oral, of the deficiencies in his work product and his failures to follow directives. Defendant declares he did not fail to follow directives from either Ms. Pochon or the Plaintiff's board of directors. Def. Decl. ¶ 2, Def. Ex. 2. As the CEO, Ms. Pochon testifies to two specific "directives" she gave to Defendant. First, a directive that Ms. Halvorson keep and grow existing dealers. Pochon Dep. 132-133. But Ms. Pochon did not deny that Mr. Halvorson was having Biweekly communications with Chris Bonner of Synthes, an ongoing buyer of Plaintiff's product. Id. at 121. The communications between Defendant and such client were discussed in an email dated August 26, 2016. Id.  While Ms. Pochon thinks he probably did meet with Mr. Bonner, it is her assumption that he was not having these communications because of the lack of increased sales. Id. at 122. She claims that Comeg had one or two other dealers, apart from Synthes, that her directive refers to. Id. at 132-133.

Second, Ms. Pochon testifies that she directed the Defendant to that he go into the

field with reps. Id. Ms. Nelson, however, made a statement that "[defendant] spent some time in the field with people." Nelson Dep. 108. In his own words Defendant spent "20% to 40% of [his] time out of the office" and the rest of the time in the office. Def. Dep. 77:4-6. Moreover, there is no evidence to suggest that outside of Ms. Pochon Defendant was receiving any directives from the Board. Mr. Halvorson was having weekly conversations with Mr. Harbuck, a board member, who did not give any directives to Defendant. Harbuck Dep. 92:13-24. Mr. Harbuck claims Ms. Pochon was his direct supervisor, he could not give directives to the defendant. Harbuck Dep. 28.

Plaintiff cites additional reasons for Defendant's termination as directives that Defendant failed to meet. However, Defendant directly claims that he did perform obligations cited by the Plaintiff as reasons for his termination. Without more evidence, the record is replete with factual disputes regarding Plaintiff's "directives" and cause for termination.

As to the issue of meeting with clients, an email, sent to Ms. Pochon, refers to "a scheduled meeting with Medtronics during the AAGL congress and that they have an interest in the video endoscopy." Def. Dep. 63:5-9. In his deposition, Defendant recalled working with clients and listed "Medtronic," "Endocopy Services," "Optum," and D-Scope" Id. 85-86. During that deposition is was brought to Defendant's attention that he has no evidence of meetings with these clients, however, it is not the Court's place to weigh credibility of the witnesses. Both parties in this case rely largely on testimony and lack other evidentiary support for their allegations.

Defendant further testified that was reporting to his CEO. Defendant has claimed that "I sent her updates on, basically, a monthly basis for the projections" Def. Dep. 64:4-5. In response to a question concerning one specific communication with Ms.

Pochon, Defendant explained that he "wrote emails along the way giving Marie Laure updates on if interesting things were occurring. It was not uncommon to send her notes." Id. 63:10-12. Finally, there are additional emails between the Defendant and Ms. Pochon referenced in the record. See Pochon Dep. 121.

The record does not contain undisputed evidence of repeated notice to follow directives or of deficiency. While testimony reflects is that the issues with Comeg's success, in general terms, was addressed, Defendant states "I don't think that they ever said that I wasn't performing well. We talked about the business not performing well." Def. Dep. 64:4-5; 77:23-25. According to Ms. Pochon, she called Defendant in August 2016 during which she did "everything to wake him up, to make him understand." Pochon Dep. 69:1-9. However, the basis of the conversation pertained to sales development. Pochon Dep. 70:17-25 71:1-11. It is not disputed that Ms. Pochon expressed her disappointment that the sales take off was "far from plan." Def. Dep. 78:4-16.

Notwithstanding, in October 2016, Defendant received a positive review from Mr. Harbuck. See Harbuck Memo, Def Ex. G. Although Mr. Harbuck now insists that his feed back to Defendant was to help his confidence, it states that he was impressed with Defendant. Mr. Harbuck testified that "I thought that Eric had the capability to potentially do what was needed to be done. I gave him confidence that he could do it. It was up to him to do the rest." Harbuck Dep. 57:13-16. While the Harbuck Memo did contain certain concerns and criticism, Defendant followed up with Mr. Harbuck and addressed some of those concerns and Mr. Harbuck's next visit was aimed more at the business itself. Harbuck Dep. 61.

Although Plaintiff points to Defendant's failure to meet sales projections as a

directive, Defendant testified that "Plaintiff never directed me that I was 'expected and required' to meet the sales forecasts that I provided" Def. Decl. ¶ 5. In her deposition, Ms. Pochon even alludes to the fact that the sales projections were set goals, which defendant did update. She stated that the Defendant gave her "the feeling that, okay, I sent to you a forecast in January. We will not meet the forecast, but it's not important. I will send you a new forecast. Probably, in some big companies, it's acceptable, but in a company like Acteon, it's absolutely not acceptable to think that it is normal to reforecast and to change by half each of your commitments." Pochon Dep. 86:23-85:13. Ms. Pochon may have felt that Defendant's actions were "not in accordance to the company," especially considering Plaintiff is "a company where the people are really committed to the results," but this does not prove that Defendant failed to follow a directive. Id.

Likewise, there are genuine disputes of material fact as to whether the sales projections, and other reasons for termination were a "material breach" of the Defendants obligations, pursuant to the for-cause clause in his contract. Plaintiff argues that for cause, as defined in the Employment Contract, includes performance-based termination "because it requires him to perform the commitments, duties and obligations if the job." Oral Arg. Tr. 24:25-26:7. As discussed above, the record consists of major disputes of fact as the reasoning behind Defendant's termination. Importantly, even if Defendant failed to perform in every aspect as cited by the Plaintiff, there remains a dispute as to whether this was a material breach.

All parties agree that the business and market that Plaintiff was entering, with Defendant leading the way, was a difficult task; the U.S, market was going to be challenging. At one point, the CEO referred to Defendant's role as building the company

from "scratch." Pochon Dep. 15:22-25. The market was competitive and building up the company was going to take time. Id. at 28; 15:23-16:6. Defendant further suggests that there were additional problems within Comeg that he had to deal with in his role. These "hurdles" were addressed to Mr. Harbuck:

Q. Did Eric or Andrea, during the October meeting or at any time, relate to you any challenges or hurdles they were facing in selling products?

A. Sure.

Q. What?

A. It would have been pricing or COGS, cost of goods sold, new products coming to market with the IFU, instructions for use, not really meeting U.S. standards, which had to be changed, modified.

Harbuck Dep. 55:16-25.

Ms. Nelson testified that in May 2016 "[n]umbers, targets, products, everything [was] subject to change," there was no values yet because they had not put products in anyone's hands. Nelson Dep. 101:9-25. They did not have most of the product needed by July. Id. at 106:19-20. Defendant also mentioned a "significant backorder" on the product line. Def. Dep. 74:11-13. "We needed endoscopes to show the customer in order to sell . . . we were given update on when we would receive our demo." Def. Dep 74. Ms. Pochon admits that there was a "big problem" in March and April, which was solved in the autumn. Pochon Dep. 135:1-5. Plaintiff contends that this defense is only speculation as to "a short period of production delays for one product, or an FDA approval delay for a few products, amongst hundreds, was the cause of his failure to live up to his own sales projections." Ms. Nelson also testified that she was unsure the exact reason for lacking product in July. Nelson 106:23-24. According to Ms. Nelson Defendant's "idea of how things were going in the field and communication were very unrealistic" which was an

"uneasy" feeling for the Comeg sales team. Nelson Dep. 108:13-16. Ms. Nelson testifies that there was "inconsistent communication and repeating [of] strategies." Id. at 148:4-6, 19-25. As such, conflicting testimony presents another genuine dispute over the obstacles Defendant may or may not have faced while General Manager.

Finally, CEO, Ms. Pochon further testified that Defendant was terminated because (1) he was not providing receipts for expenses, against Acteon Rules; (2) he recruited Ms. Nelson without disclaiming she was being paid a Sales Director Salary; (3) Plaintiff's CFO sent Defendant an email in September regarding his behavior asking him to comply with Company expense rules (4) Defendant was not the one reviewing the reports, rather his assistant was checking expense reports and Defendant was signing them. See Pochon Dep. 81-83. There is undisputed evidence in the record that Defendant was not performing some of his duties.

Defendant admits that he was not approving expense reports. Instead, Defendant delegated that duty to his administrative assistant, Denise, which Plaintiff's assert was solely his responsibility. In September 2016, an email from company CFO asks the Defendant to comply with Company expense rules. However, Defendant testified he had reviewed some and that he did not think that authority from Pochon or the board was required to delegate his responsibilities. Def. Dep. 94:13-16; 101:1-2.

According to Defendant, he was also not required to inform the board or Ms. Pochon of Ms. Nelson's specific responsibilities. Id. at 53:21-25. He claims he was "never given a directive not to hire a sales director." To further dispute Ms. Pochon's justifications for defendant's termination, when asked: "Did you tell him not to hire a Sales Director or did he say he would not hire a Sales Director or something else?", Ms. Pochon testified that she did not know. Pochon Dep. 28:20-25. Rather, Ms. Pochon claims it was clear

from their conversations together. While Plaintiff contends that Defendant's Assistant and Ms. Nelson were being paid a high of a salary without approval, it is not disputed that "Marie Pochon was located primarily in France, [and] Defendant was given great autonomy to hire staff, run his sales team and grow Comeg." Pl. SOUMF ¶9.

Both parties agree that the remaining justification for Defendant's termination, regarding the approval of expenses from employees misusing their company accounts, was not discovered by Plaintiff until after this litigation commenced. Oral Arg. Tr. 18. However, Plaintiff's think the additional information learned through discovery after filing suit "serve to preclude" the Defendant from his severance payment. Id. at 26. "The after-acquired evidence doctrine has been approved by the United States Supreme Court not, however, in the breach of employment contract context, but in the context of employment discrimination." Dobinsky v. Crompton & Knowles Colors Inc., No. 3:02CV1291, 2004 WL 2303686, at *4 (M.D. Pa. Mar. 30, 2004) (citing McKennon v. Nashville Banner Publishing co., 513 U.S. 352 (1995)). After acquired evidence – Defendant says even if known prior to the decision to terminate would still not justify the termination as for cause. Oral Arg. Tr. at 12.

Here, Plaintiff has not proven that its after-acquired evidence is in fact true, that Defendant knew employees were misusing their accounts and that he approved those reports knowing that information. Regardless, the Third Circuit has held that after-acquired evidence could not be used "substantively for the purpose of defending against liability." Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221, 1238 (3d Cir. 1994). As a result, the information Plaintiff learned after terminating Defendant is inapposite as it pertains to the issue of whether Plaintiff fired the Defendant for cause.

There is no dispute as to the fact that Comeg had not reached the initial projected $4 million in sales, nor is there a dispute over the fact that Plaintiff was not happy with the Comeg's sales while Defendant was employed there. However, there are great disputes of fact as to whether Defendant was meeting with clients, reporting to his CEO, whether he was responding to "directives."  In short, Defendant argues that Plaintiff did not want to pay him severance and have now "conjured up a for-cause termination." Oral Arg. Tr. 3:17-25.

Looking at the evidence in a light most favorable to Defendant as the non-moving party, a reasonable jury could conclude that Plaintiff's did not fire the Defendant for-cause. Plaintiff did not explain its reason for terminating plaintiff in its letter that stated this was a for-cause removal. In her deposition, CEO Ms. Pochon further described that "the problem was that the sales were not developing, and even decreasing." Pochon Dep. 29:6-11. At the termination meeting held with Defendant, she recalled explaining to him "that the results were not there and [she] was not satisfied of the way he was driving the commercial part of the - - of Comeg in the U.S." She further explained that the General Manger in the company was expected to be in the field, "not sitting in his office" a "major lack" was that he was not with customers.

There is enough evidence for a reasonable inference that Plaintiff was simply unhappy with the Defendant's performance, mainly that Comeg was not meeting sales projections. Though Plaintiff comes forth with evidence that Defendant was not performing his job, and even neglecting some of his responsibilities, the Plaintiff has not shown that it is entitled to declaratory judgment, which as previously explained, is appropriate to resolve legal issues.

Here, the Employment Agreement makes clear that Defendant's <u>material breach</u> "of

any of executive's commitments, duties, or obligations" under the agreement is reasoning for a "for cause" removal. However, whether Defendant's alleged poor performance amounts to a material breach is a question of fact for the jury to decide. <u>Chance v. McCann</u>, 405 N.J. Super. 547, 566, 966 A.2d 29, 42 (App. Div. 2009) ("Whether conduct constitutes a material breach is ordinarily a question reserved for disposition by the jury."); <u>Zelnick v. Morristown-Beard Sch.</u>, 445 N.J. Super. 250, 260 (Law. Div. 2015) ("The construction of contract terms and whether the manner in which they were executed constitutes a breach is an issue of fact best left for a jury.") (citation omitted).

IV.   <u>Conclusion</u>

For the foregoing reasons, the Court grants Defendants Motion for Summary Judgment in part, as to Count II and III of Plaintiff's complaint, and Plaintiff's Motion for Summary Judgment in the form of Declaratory Judgment is denied.


An appropriate Order shall issue.

Dated: September 25, 2019


     s/ Joseph H. Rodriguez    <br>Hon. Joseph H. Rodriguez,<br>UNITED STATES DISTRICT JUDGE